IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSALYNN M. BROWN and CAROLYN WILSON, | ) ) ) |
| Plaintiff, | ) No. 09 C 5386 |
| v. | ) ) Judge Robert W. Gettleman |
| ADVOCATE SOUTH SUBURBAN HOSPITAL and ADVOCATE HEALTH & HOSPITALS CORPORATION, | ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Josalynn M. Brown ("Brown") and Carolyn Wilson ("Wilson") filed an amended complaint against their employer, Advocate South Suburban Hospital and Advocate Health & Hospitals Corporation (collectively, "Advocate"), alleging discrimination based on race and retaliation pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000(e), and 42 U.S.C. § 1981. Defendants have filed the instant motion for summary judgment. Defendants have also moved to strike portions of plaintiffs' L.R. 56.1(b)(3) statement of facts and plaintiffs' response to defendants' L.R. 56.1(a)(3) statement of facts. For the following reasons, defendants' summary judgment motion and motion to strike are granted.

## BACKGROUND

Plaintiffs are African-American women who were employed as registered nurses ("RNs") at two Advocate facilities, where they allege that they suffered discrimination based on their race. Plaintiffs further allege that when they complained to defendants about that discrimination,

defendants retaliated against them. The following facts are, unless otherwise specified, undisputed and come from the parties' L.R. 56.1 statements.

**A. Plaintiffs' Employment at Advocate Christ Medical Center**

Wilson and Brown began working as registered nurses in the 9EW unit at Advocate Christ Medical Center ("ACMC") in August and October 2005, respectively. They both worked on the 3:00 p.m. to 11:00 p.m. shift. The 9EW Unit had a Unit Council, comprised of staff members who met to address the 9EW staff's concerns. From February 2006 until July or August 2008, Wilson served as Vice President of the 9EW Unit Council. During that time, African-American nurses approached Wilson in that capacity to complain about their assignments and training opportunities.

On May 10, 2008, plaintiffs and 10 other nurses on 9EW signed and submitted a Petition for Change in Labor Practices (the "letter") to Human Resources, setting forth a series of complaints about discriminatory treatment on 9EW: (1) African-American nurses on 9EW had heavier assignments and more patients than Filipino nurses on 9EW; (2) Filipino nurses were always "in charge" while experienced African-American nurses were not trained to be in charge; (3) experienced African-American nurses did not get the opportunity to precept while new nurses with less experiences were "always precepting"; (4) there were nurses who had not received training to use a Ventricular Assist Device ("VAD"); (5) the Filipino weekend night shift Team Leader (a non-supervisory position) "had difficulty" granting African-American nurses their schedule requests but accommodated Filipino nurses; (6) Filipino nurses were "plotting" and "negotiating" charge and VAD positions in their native language; and (7) one African-American nurse's paid time off was not deducted accordingly.

Terri Sisler, then Associate Relations Specialist in Human Resources at ACMC, received the letter on or about June 27, 2008. Sisler, along with the Associate Relations Team and the 9EW manager Joseph Newsome, investigated the allegations. They concluded that the allegations could not be corroborated.

**B. Roles, Positions, and Training**

When plaintiffs were hired at ACMC, Susan Massatt was the manager of 9EW, but by March 2008, Joseph Newsome had assumed that role. Team Leaders on the 9EW Unit functionally directed their own shift. Newsome assigned Team Leaders tasks such as scheduling and payroll, and had to give final approval for all decisions. Team Leaders had no authority to discipline, hire or terminate employees.

The charge nurse role was assigned to RNs on 9EW on a rotating basis when the Team Leader was unavailable. The charge nurse was responsible for the operations of a particular shift on a particular day, such as handling patient complaints, reacting to staffing needs and distributing the incoming shift's patient assignments.

A preceptor is an RN who trains and mentors new nurses. The preceptor role was assigned to RNs on 9EW based on the availability of new nurses on the shift who possessed the clinical knowledge and experience to train new nurses. Because nurses spent a majority of their orientation on the day shift, there were fewer opportunities to precept on evening night shifts. The preceptor and charge nurse assignments were not different positions, but rather different roles for RNs.

Registered nurses who had been with 9EW for at least one year and had good clinical skills could be offered training to use a VAD, a mechanical pump that takes over the function of

3

the heart. There were, on average, 2 or 3 VAD patients out of 36 total patients in the Unit. The number of RNs trained in VAD treatment was limited to allow the trained nurses to have more exposure to VAD patients, resulting in a safer care environment. Nurses on twelve-hour shifts were selected more often for VAD training for continuity of care purposes. Both Brown and Wilson received VAD training in 2007.

Patient assignments were given to RNs on 9EW based on the patients' acuity level and the RN's experience and expertise to try to achieve the most balanced workload for each nurse. Patient acuity is a management tool designed to measure or forecast the nursing time required to care for a patient.

### C. Plaintiffs' Employment at ASHS

Wilson and Brown resigned from their positions at ACMC on September 15, 2008, and September 16th, 2008, respectively. Both plaintiffs began working as RNs in the ER at Advocate South Suburban Hospital ("ASSH") in October 2008. After being hired, plaintiffs became concerned about what they perceived to be safety issues, unfair and unequal work assignments, and a nonresponsive management.

Brown reported to her Supervisor, Laurie Round, that she was given no help on the night shift and that the Assistant Clinic Manger would go to sleep while on duty. Brown also reported directly to the Human Resources Representative that the Telemetry Unit was unprofessional and unfair in assigning newly admitted patients. On March 12, 2009, Wilson emailed Brenda Rocha to report a safety concern about monitoring and communication problems caused by patients being put in rooms on both sides of the ER.

Over time, plaintiffs came to believe that the purportedly unfair workload and assignments were occurring because of their race. Accordingly, Brown went over the head of her Supervisors and Manager to the Human Resources Representative to complain about wrongful accusations made against African American employees, supervisor rudeness towards African American employees and failure to address the issues they brought up. Brown also wrote an email to the President and Vice President of the Hospital in which she criticized the management and handling of patient safety issues by Round and Rocha.

### D. Plaintiffs' Applications for Other Positions

#### a. Plaintiff Brown

In March 2009, Brown began applying for positions at other Advocate facilities. None of these positions offered more pay, and some were of a lower grade than her position at ASSH. Among other positions, Brown applied for an RN position in the Adult Surgical Health Unit ("ASHU") at ACMC. Brown was interviewed by Ronnie Anderson, an on-site staffing consultant, and Jennifer Booth, Manger of ASHU. Brown then completed the peer interview process[1], where she received the second lowest peer interview score of all interviewed applicants. She was not hired for the position.

Brown believes she was not hired for the ASHU position because of the letter she signed while at 9EW. Anderson testified that Brown was not hired because of her low peer interview scores.

---

[1] Peer interviews are interviews conducted by employees who will work with the candidate if the candidate is hired.

### b. Plaintiff Wilson

In March 2009, Wilson also applied for the EN position in the ASHU, and was also interviewed by Anderson and Booth. Wilson then completed the peer interview process, where she received the lowest score of all interviewed applicants. She was not hired for the position. After being turned down for the ASHU position, Wilson wrote an email to Jennifer booth, explaining that, as 9EW Unit Council Vice President, she had expressed concerns about racial tensions and unequal treatment that led other nurses to create a petition. Booth forwarded that email to Ronnie Anderson, but Anderson never saw the petition referenced in the email. Anderson testified that he never used the information contained in Wilson's email to prevent Wilson from getting hired for any of the positions for which she has applied, and further testified that he knows of no one else who did.

Since March 2009, Wilson claims to have applied for over one hundred positions at Advocate but has not been hired for any of them. Forty-three of these positions were cancelled without being filled. Wilson admits to applying for positions for which she was not qualified. Wilson also admits that despite being required to work at ASSH for six months before applying to transfer, she applied to several positions before that amount of time passed. Due to a medical condition and related treatment, Wilson has been unable to provide any direct patient care from January 2010 to present.

Wilson believes that she has not received any of these positions because of the 9EW letter she signed. For those positions not cancelled, Advocate maintains that they hired the candidate that most closely met the requirements of the respective positions.

6

**E. Charges of Discrimination and Filing of Instant Lawsuit**

Wilson filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on May 14, 2009. Brown filed a Charge of Discrimination with the EEOC on May 18, 2009. Plaintiffs filed the instant lawsuit on August 31, 2009, and their first amended complaint on February 26, 2010.

## DISCUSSION

**A. Summary Judgment Standard**

A movant is entitled to summary judgment under Rule 56 when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Unterreiner v. Volkswagen of Am., Inc., 8 F.3d 1206, 1209 (7th Cir. 1993). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. See Fed. R. Civ. P. 56(c); Becker v. Tenenbaum–Hill Assocs., Inc., 914 F.2d 107, 110 (7th Cir. 1990).[2] The court considers the

---

[2] Defendants have moved to strike ¶¶ 40, 54, 56, and 75 of plaintiffs' response to defendants' 56.1(a)(3) statement, which state that plaintiffs "can neither admit nor deny the allegations because [they] have no knowledge thereof." These responses are improper, and the court accordingly strikes them and deems the facts set forth therein admitted. Defendants have also moved to strike ¶¶ 26, 60, and 61 of plaintiffs' response to defendants' statement of facts because plaintiffs deny these statements but fail to point to properly supported evidence that contradicts them. That request to strike is also granted, as is defendants' request that the court strike the extra information in ¶ 63 of plaintiffs' response, which impermissibly includes further information after it admits the allegations in the corresponding paragraph of defendants' L.R. 56.1(a)(3) statement.
     Finally, defendants have also moved to strike certain portions of plaintiffs' L.R. 56.1(b)(3) additional statement of facts that mischaracterize the evidence on which they purport to rely (¶¶ 1, 9, 13, 20, 24, 25, 29, 33, 34, and 40), contradict plaintiffs' own deposition testimony (¶ 33), and rely on deposition testimony from a witness who lacks personal knowledge of the subject matter (¶¶ 1, 24, 25, 29-30, 34, and 38). The court agrees and

(continued...)

record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. See Fisher v. Transco Services–Milwaukee Inc., 979 F.2d 1239, 1242 (7th Cir. 1992).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Stewart v. McGinnis, 5 F.3d 1031, 1033 (7th Cir. 1993). This standard is applied with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. See Sarsha v. Sears. Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir. 1993). The nonmoving party must, however, do more than simply show that there is some metaphysical doubt as to the material facts. Matsushita Elec. Indus. Co., v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252.

### B. Pattern and Practice Discrimination Under § 1981

Defendants argue that plaintiffs' § 1981 pattern and practice claim fails both because plaintiffs have not filed this lawsuit as a class action, and because plaintiffs have not established that Advocate's standard operating procedure discriminates against African-Americans. Plaintiffs did not respond to either of defendants' pattern and practice arguments, and have thereby abandoned those claims. See Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 n.2 (7th Cir. 1996). The court therefore grants summary judgment in favor of defendants on plaintiff's § 1981 pattern and practice claims.

---

[2](...continued)
accordingly strikes those portions of plaintiffs' additional statement of facts.

## C. Race Discrimination

To state a claim for intentional discrimination under Title VII, a plaintiff has two options: she may satisfy her burden through the direct method of proof, or she may demonstrate discriminatory intent indirectly by following the burden-shifting framework. See Adams v. Wal-Mart Stores, Inc., 324 F.3d 935, 938 (7th Cir. 2003). Plaintiffs argue that there is evidence to satisfy the burden of proof using either method.

### 1. Direct Method

To survive summary judgment under the direct method of proof, a plaintiff must present either direct evidence of discriminatory intent, such as an admission, or enough circumstantial evidence to create a "convincing mosaic" that would allow a rational jury to infer that discriminatory intent motivated the adverse action. Silverman v. Bd. of Educ. of City of Chicago, 637 F.3d 729, 733-34 (7th Cir. 2011). Circumstantial evidence may include suspicious timing, ambiguous statements, behavior or comments directed at others in the protected class, and evidence that similarly situated employees outside the protected class received systematically better treatment. See Darchak v. City of Chicago Bd. of Educ., 580 F.3d 622, 631 (7th Cir. 2009). Whatever circumstantial evidence a plaintiff presents "must point directly to a discriminatory reason for the employer's action." Adams, 324 F.3d at 939.

Plaintiffs argue that they have presented enough circumstantial evidence to allow a rational jury to infer that discriminatory intent motivated adverse action. They argue that the following constitutes such circumstantial evidence: (1) Brown's complaints to Human Resources that African-Americans were "always" wrongly accused and that the House Supervisor was rude to African-Americans and "doesn't address issues"; (2) the House Supervisor was not

9

disciplined; (3) plaintiffs were subjected to unequal workload and treatment in the workplace; and (4) their supervisors retaliated against them and attempted to discipline or terminate them.

Defendants argue that plaintiffs' evidence, in this regard, consists almost exclusively of conclusory statements that they were subjected to unfair treatment, retaliation, and racism. The court agrees. Beyond their speculative assertions, plaintiffs present no evidence that they were given unequal workloads or assignments, that they received any undue discipline,[3] or that there were any attempts to discipline or terminate them. Mere conclusory statements, absent supporting admissible evidence, are insufficient to defeat summary judgment. Adams, 324 F.3d at 939. What remains—that Brown complained to Human Resources about a House Supervisor who was not later disciplined—is not sufficient circumstantial evidence to allow a rational jury to infer that discriminatory intent motivated an adverse action. Thus, plaintiffs must proceed through the indirect method.

**2. Indirect Method**

Plaintiffs also fail to establish a prima facie case under the indirect method. To do so, a plaintiff must present evidence that: (1) she is a member of a protected class; (2) she reasonably performed her job to her employer's expectations; (3) she was subjected to an adverse employment action; and (4) other similarly situated employees outside the protected class were treated more favorably by the defendant. Davis v. Con-Way Transp. Cent. Express, Inc., 368 F.3d 776, 784 (7th Cir. 2004). If the plaintiff meets this burden, the burden of production shifts to the employer to produce a legitimate, non-discriminatory reason for its action. Id. If the

---

[3]Although Wilson received a written warning in her personnel file regarding inaccurately recorded unexcused absences, that warning was corrected and never progressed into formal discipline of any kind.

employer produces a non-discriminatory reason, the plaintiff must then prove that the employer's articulated reason is mere pretext for discrimination.  Id.

Defendants argue that plaintiffs' claim fails the indirect method for three independent reasons: (1) plaintiffs did not suffer an adverse action; (2) plaintiffs cannot show that defendants treated similarly situated employees that were not members of the protected class differently; and (3) plaintiffs cannot establish that defendants' legitimate, non-discriminatory reasons for its actions are pretextual.

An adverse action "is something more disruptive than a mere inconvenience or alteration of job duties."  Nichols v. S. Ill. Univ.-Edwardsville, 510 F.3d 772, 780 (7th Cir. 2007) (internal quotations omitted).  Plaintiffs characterize the following concrete alleged actions as adverse: (1) denial of scheduling requests; (2) assignment of increased workloads; (3) deprivation of training opportunities; and (4) deprivation of opportunities to fill charge nurse and preceptor roles.

Denying scheduling requests and assigning increased workloads are not adverse actions. See Grube v. Lau Indus., Inc., 257 F.3d 723, 728-30 (7th Cir. 2001) (holding that a change in work hours, absent a decrease in pay or responsibility, is not an adverse employment action); Haugerud v. Amery Sch. Dist., 259 F.3d 678, 692 (7th Cir. 2001) (increased workload did not constitute an adverse action).

Plaintiffs were not deprived of training opportunities; they both received VAD training in 2007 and they do not claim to have been denied any other type of training.  Even if they had been denied some form of training, such denial alone would not constitute an adverse action. See Needy v. Vill. of Woodridge, No. 96 C 5188, 1997 U.S. Dist. LEXIS 11813, at *18

11

("[D]eprivations of training opportunities do not constitute an adverse employment action under Title VII.").

Lastly, the alleged unequal assignment of charge nurse and preceptor roles is insufficient to establish an adverse action. See Nichols, 510 F.3d at 781 ("[P]urely subjective preference for one [assignment] over another" does not amount to an adverse action). The record does not show, and plaintiffs do not argue, that either of these roles would impact the plaintiff's salary, perks, or opportunities for future advancement. Rather, these are merely roles to which plaintiffs subjectively desired assignment. As such, unequal assignment of such roles does not constitute an adverse action. Id.

Plaintiffs cite to no case—from this circuit or any other—that supports their argument that the identified actions are adverse. Because none of the actions identified by plaintiffs qualify as materially adverse, plaintiffs have failed to establish a prima facie case of discrimination under the indirect method. As such, the court need not discuss defendants' alleged legitimate non-discriminatory reasons for their decisions or the issue of pretext. See Plair v. E.J. Branch & Sons, Inc., 105 F.3d 343, 347 (7th Cir. 1997); DeLuca v. Winer Indus., Inc., 53 F.3d 793, 798 (7th Cir. 1995) ("[Plaintiff's] failure to establish a prima facie case makes it unnecessary for us to discuss [defendant's] reasons for terminating him or the issue of pretext."). Thus, the court grants summary judgment on plaintiff's Title VII and § 1983 discrimination claims.

**D. Retaliation**

Plaintiffs may establish their claim for retaliation under either the direct or indirect method of proof. Stephens v. Erickson, 569 F.3d 779, 786 (7th Cir. 2009). Under the direct

method, plaintiffs must show that: (1) they engaged in a statutorily protected activity; (2) they suffered a materially adverse action; and (3) a causal connection exists between the two. Id. Plaintiffs argue only that they can satisfy the direct method.

In their first amended complaint, plaintiffs identified two actions that the court agrees constitute participation in a protected activity: (1) signing and submitting the May 10, 2008, letter, and (2) filing charges with the EEOC in May 2009. Defendants argue that plaintiffs have failed to establish either that they suffered a materially adverse action, or that there was a causal connection between their participating in a protected activity and suffering a materially adverse action.[4]

In the retaliation context, a materially adverse action is one that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." Stephens, 569 F.3d at 790 (internal quotations omitted). Plaintiffs point to the following conduct of defendants as materially adverse actions: (1) provision of unfair work assignments; (2) criticism and discipline of plaintiffs when plaintiffs brought safety issues to management's attention; (3) denial of transfers; and (4) dismissal of plaintiffs' concerns by the Human Resources Department and the President of the Hospital. For each of these actions, plaintiffs have either failed to offer evidence sufficient to support a reasonable inference that they occurred or has failed to show how they qualify as materially adverse.

Plaintiffs have provided no evidence that they received unfair work assignments. Mere conclusions, absent supporting evidence, are insufficient to create a genuine issue of triable fact.

---

[4] Defendants also correctly argue that plaintiffs cannot establish necessary elements through the indirect method. But plaintiffs argue only that they can establish their claim under the direct method. Accordingly, the court will address only the direct method.

See Burks v. Wisconsin Dep't of Transp., 464 F.3d 744, 752 n.6 (7th Cir. 2006). Plaintiffs' argument that the discipline they allegedly suffered constituted a materially adverse employment action fails because there is no evidence that either plaintiff was formally disciplined after signing the May 2008 letter.[5] Plaintiffs' unaccepted lateral transfer applications and unmet desire to work at another Advocate facility do not constitute materially adverse actions. See Dandy v. UPS, Inc., 388 F.3d 772, 781 (7th Cir. 2004).

Finally, plaintiffs have offered no evidence that either Human Resources or the Hospital President wholly dismissed their concerns. Human Resources investigated the complaints raised by the May 10 letter, and concluded that they could not be corroborated. Plaintiffs can point to no facts establishing that the Hospital President dismissed or ignored their complaints. Although plaintiffs may be dissatisfied with the responses to their complaints, such dissatisfaction does not rise to the level of a materially adverse employment action. See Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996) ("[N]ot everything that makes an employee unhappy is an actionable adverse action.").

Because plaintiffs have failed to establish that they have suffered any materially adverse employment action, they have not met their burden of establishing a prima facie case of retaliation under Title VII. Plaintiffs' retaliation claim thus fails as a matter of law.

---

[5] Although there was a written warning inaccurately placed in Wilson's personnel file regarding excessive absences, which was later corrected, this warning did not constitute formal discipline and does not rise to the level of an adverse action. Brown admits to having never received discipline.

## CONCLUSION

For the foregoing reasons, the court grants defendants' motion for summary judgment, and grants defendants' motion to strike.


**ENTER:** December 20, 2011

                                                      **Robert W. Gettleman**
                                                      **United States District Judge**